UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

TIMOTHY WILLIAMS,

                                              **Case No.: 1:22-cv-5866**

                       **Plaintiff,**

        -against-

TROMBERG, MORRIS, & POULIN, PLLC
    f/k/a STEPHEN EINSTEIN & ASSOCIATES, P.C.,
AKSANA BONDARTSEVA,
CARVER FEDERAL SAVINGS BANK,
ABC PROCESS SERVING BUREAU, INC., d/b/a
    ABC PROCESS SERVICE,
JAY BRODSKY, and
GENE J. GAGLIARDI

                         **Defendants.**

-------------------------------------------------------------------X

## COMPLAINT AND JURY DEMAND

Plaintiff brings this action for Defendants Tromberg, Morris, & Poulin, PLLC f/k/a Stephen Einstein & Associates, P.C. ("Tromberg") and its associate Aksana Bondartseva for violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*. and of New York Judiciary Law § 487 *et seq*.; against Tromberg, Bondartseva, Carver Federal Savings Bank ("Carver"), ABC Process Serving Bureau, Inc. d/b/a ABC Process Service, Jay Brodsky and Gene J. Gagliardi for violations of New York General Business Law § 349 *et seq.*, for negligence and gross negligence; and against Tromberg and Carver for conversion, and in support alleges as follows.

## SUMMARY OF CLAIMS[1]

Defendants are a debt collection law firm Tromberg, Morris, & Poulin, PLLC f/k/a Stephen Einstein & Associates, P.C. ("Tromberg") and an associate at the firm, Aksana

---

[1] This summary is for the convenience of Defendants and the Court. The summary is not intended to limit the basis of Plaintiff's claims as the full factual basis for the claims are laid out in far greater detail in the statement of facts.

Bondartseva, a judgment creditor, Carver Federal Savings Bank ("Carver"), a process serving company, ABC Process Serving Bureau, Inc. d/b/a ABC Process Service ("ABC Process"), its principal Jay Brodsky, and its process server, Gene J. Gagliardi (collectively "ABC Defendants").

In 2008, Defendant Carver Federal Savings Bank, through Defendant law firm Tromberg filed a collection lawsuit against Mr. Williams based on a debt he did not incur. Worse still, Defendants Carver and Tromberg used a false affidavit of service to obtain a "sewer service"[2] default judgment in 2008. The process server, Defendant Gagliardi of Defendant ABC Service, is notorious for executing false affidavits of service, so much so that he was repeatedly sanctioned and ultimately had has license revoked for systematically executing false affidavits.

Almost thirteen years later, on or around January 4, 2021, Tromberg, on behalf of Carver, relied on the false affidavit of service by ABC Defendants to issue an income execution to garnish Mr. Williams' wages and had a marshal serve it on the employer of Mr. Williams.  The notice of garnishment from the marshal on or around January 11, 2021 was the first time Mr. Williams learned of the lawsuit or the judgment. Mr. Williams called the Marshal to tell them that he had no judgment against him and this judgment appeared to be against a "Timothy William" rather than Timothy Williams. The Marshal told him that it would be taken care of, and so Mr. Williams thought the issue had been resolved. But months later, on April 7, 2021, Defendants began to garnish money from Mr. Williams' paycheck. When Mr. Williams realized that money was being garnished from his paychecks, he called Tromberg to figure out why, but Tromberg would not give him any information. Mr. Williams, *pro se*, filed an Order to Show

---

2 *See, e.g. Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 418 (S.D.N.Y. 2010) ("'[S]ewer service" [is] the practice of failing to serve a summons and complaint and then filing a fraudulent affidavit attesting to service. When the debtors failed to appear in court because they did not have notice of the lawsuits, defendants obtained default judgments against them.")

Cause (OSC) to vacate the default judgment on December 28, 2021. Defendants Carver and Tromberg doubled down. By 2021, Mr. Gagliardi's systematical sewer services was well documented and well known, and his process server license has been suspended since 2009. Despite this, and despite Mr. Williams representing that he was incarcerated during the time he was allegedly served, Carver and Tromberg, through the attorney Bondartseva, filed an Opposition to the OSC relying on the false affidavit of service to attempt to retain the illicit benefit of the fraudulently obtained judgment by opposing Mr. Williams' OSC.

After weeks of stress, expenses for postage, copies, travel and notarization, and garnished wages from work, on April 27, 2022, Mr. Williams ultimately succeeded ivacating the default judgment and discontinuing the action. The Court also orally ordered Tromberg and Carver to immediately return the money they previously garnished, which was $3,571.99.

The Court told Mr. Williams that he would be returned the money that had been garnished from his paychecks, $3,571.99 in total, but as of this filing, close to five months after the judgment was vacated and the action discontinued, Defendants have not returned this money. For a homeless formerly incarcerated person like Mr. Williams, being deprived of $3,571.99 is a significant burden.

## A.  JURISDICTION AND VENUE

1.      The Court has federal question jurisdiction over the lawsuit because the action arises under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, ("FDCPA"). Jurisdiction of the Court arises under 28 U.S.C. § 1331 because this dispute involves predominant issues of federal law, the FDCPA. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202. The Court has supplemental jurisdiction under 28 U.S.C. §1367 over Plaintiff's state law claims because said claims are so related to the claims within the Court's original jurisdiction that they

form part of the same case or controversy under Article III of the United States Constitution.

2.      Venue in this District is proper because all or a substantial part of the events or omissions giving rise to their claims occurred in Kings County, New York.

### B.   PARTIES

3.      Plaintiff Timothy Williams was an individual residing in Kings County, New York. As of this filing, he is homeless and living in a shelter in New York County, New York.

4.      Defendant Tromberg, Morris, & Poulin, PLLC f/k/a Stephen Einstein & Associates ("Tromberg") is a professional limited liability corporation organized under the laws of the State of New York, with its principal place of business at 39 Broadway Suite 1250, New York, NY 10006. This suit arose out of Tromberg's business in New York.

5.      Tromberg regularly collects on consumer debts owed or due another via sending thousands of collection letters, file thousands of collection lawsuits, and collecting on judgments by using thousands of information subpoenas, bank restraints, and income executions, and the collection of consumer debts is the principal purpose of Tromberg's business. Tromberg is therefore a "debt collector" as defined in 15 U.S.C. § 1692a(6).

6.      Defendant Aksana Bondartseva is an associate at Tromberg. Bondartseva, on information and belief, is a resident of the State of New York. Bondartseva regularly collects on consumer debts owed or due another by drafting and signing hundreds of oppositions to orders to show cause in collection lawsuits brought by Tromberg. Bondartseva is therefore a "debt collector" as defined in 15 U.S.C. § 1692a(6).

7.      Defendant Carver Federal Savings Bank ("Carver") is a FDIC insured domestic corporation organized under the laws of the State of New York. This suit arises from the

business and conduct of Carver in New York State.

8.      Defendant ABC Process Serving Bureau, Inc. d/b/a ABC Process Service ("ABC") is a process serving agency organized under the laws of the State of New York.  ABC regularly fails to serve summons and complaints, and regularly executes false affidavits of service allowing the entry of default judgments against putative debtors.

9.      Jay Brodsky is the sole shareholder, president, and manager of ABC and a resident of the state of New York.

10.     Brodksy established and executes the business structure, payment structure, and policies and procedures of ABC, including negligent hiring and supervision.

11.     Brodsky is personally liable for the process server misconduct that forms the basis of this suit.  Brodsky has set up a company that hires exclusively or almost exclusively process servers who have repeatedly been disciplined or even had their licenses revoked in process serving. He either is intentionally setting up a fraudulent business model, consciously disregarding the use of sewer service process servers, or negligently hiring and supervising his process servers. Even something as simple as a FOIL request to the Department of Consumer Affairs would demonstrate the fraudulent He also had set up a payment structure that encourages and almost guarantees sewer service by not paying process servers in consumer credit cases unless they provide and affidavit of service that shows successful service, and pays his process servers as little as three dollars per service. The process servers he uses has such a large volume of executed affidavits of service that Brodsky knows, consciously disregards or is negligent to the fact that an individual process server could not possibly make so many executions per week.

12.     Defendant Gene J. Gagliardi ("Gagliardi") was a process server for ABC Process who executed the false affidavit of service contending that he served the collection lawsuit on

Timothy Williams at an address Mr. Williams never lived at. Mr. Gagliardi is a notorious sewer service process server whose license was suspended by the New York City Department of Consumer Affairs in 2009, a suspension which remains in effect. Mr. Gagliardi regularly failed to serve summons and complaints, and regularly executed false affidavits of service allowing debt collectors, including Tromberg, to enter default judgments against consumers such as Mr. Williams.

13. Gagliardi was acting within the course and scope of his employment with ABC.

### C.  STATEMENT OF FACTS

14.     On September 15, 2005, Mr. Williams was arrested.

15.     On October 5, 2005, a grand jury returned an indictment against Mr. Williams, and on October 20, 2005, he was arraigned in Kings County Criminal Court and held on bail.

16.     Mr. Williams remained in custody from October 20, 2005 until July 27, 2006.

17.     On July 27, 2006, Mr. Williams was convicted in Kings County Criminal Court and sentenced to 16 months to 4 years in prison.

18.     Unbeknownst to Mr. Williams at that time, his identity was fraudulently used on or around August 29, 2006 to allegedly open a checking account at Carver Federal Savings Bank. **Exhibit A** (Fraudulent Account Application).

19.     While the scan is barely legible, it appears that Carver alleges this account application was made with a photo ID issued by the state of Ohio. *Id.*

20.     Mr. Williams has never lived in Ohio and has never been issued photo identification by the state of Ohio. *Id.*

21.     The signature on the application does not resemble in anyway Mr. Williams' signature.

22.     Lastly, the birth date on the application is incorrect.[3]

23.     On August 30, 2006, Mr. Williams was sentenced in Kings County Criminal Court

24.     On October 3, 2006, Mr. Williams was incarcerated at Ulster Correctional Facility.

25.     On October 12, 2006, he was transferred to Greene Correctional Facility.

26.     More than a hundred miles away, on or around December 13, 2006, Carver alleges that Mr. Williams tendered checks to Carver which were returned due to insufficient funds, resulting in Mr. Williams owing $1,039 to Carver.

27.     Mr. Williams of course could not have possibly deposited any checks with Carver while he was incarcerated more than a hundred miles away.

28.     Mr. Williams meanwhile was transferred between a few different correctional facilities until he was transferred to Five Points Correctional Facility in Romulus, New York on January 18, 2008, where he would serve the remainder of his sentence.

29.     On or about May 19, 2008, Carver, filed a summons and verified complaint by and through Tromberg, which at the time used the name Stephen Einstein & Associates, P.C., against Mr. Williams, titled *Carver Federal Savings Bank v. Timothy Williams,* Index No. 65923-08/KI venued in the Civil Court of the City of New York, County of Kings (the "Collection Lawsuit"). **Exhibit B** (Summons and Complaint).  The Collection Lawsuit stated it was for a "Consumer Credit Transaction." The complaint was signed and verified by Tromberg.

### Judgment based on False Affidavit of Service

30.     Defendants never served the Summons and Complaint on Mr. Williams.

31.     On or about June 5, 2008, Carver through Tromberg filed an affidavit of service in the collections lawsuit, alleging service on Mr. Williams at the address 368 Grand Avenue, 1st Floor,

---

3 To prevent further theft of Mr. Williams' identity, both the false birthdate and his actual birthdate are not disclosed here.

on June 4, 2008 by leaving the Summons and Complaint with "MR. WILLIAM, RELATIVE, RELATIVE." **Exhibit C** (Affidavit of Service).

32.     The Affidavit of Service was notarized by Defendant Jay Brodsky.

33.     The affidavit filed purports that the 368 Grand Avenue address was Mr. Williams' "last known residence" – this is false.

34.     Mr. Williams never lived at this address.

35.     Mr. Williams' last name is "Williams," not "William," and thus he does not have any relatives named "Mr. Williams."

36.     Further, no relative of Mr. Williams' lived at the address.

37.     And Mr. Williams himself was currently residing in the Five Points Correctional Facility, about 255 miles away from the 368 Grand Avenue address.

38.     Even before being incarcerated, Mr. Williams lived at 501 Franklin Avenue, Brooklyn, NY 11238, not the 368 Grand Avenue address.

39.     The process server was Gene J. Gagliardi ("Gagliardi"), DCA License No. 0872214.

40.     From February 29, 2000 to the surrender of his license on July 21, 2009, only about a year after the Affidavit of Service here, Mr. Gagliardi engaged in repeated and widespread acts of process service misconduct, as catalogued in the New York Unified Court System – Office of Internal Affairs Analysis of Server's Five Busiest Days. **Exhibit D** (Gagliardi Report).

41.     The Report showed that Gagliardi claimed to have served process so quickly that it defied any reasonable estimation of the time needed to travel from one location to another.

42.     For example, Gagliardi claimed to have served process on an address in Brooklyn at 7:16 A.M. on February 14, 2007, and then served process on an address in New Rochelle at 7:19 A.M. The Google estimate for time needed to travel between these locations by car was 41

minutes – Gagliardi claimed to have done it in less than 3 minutes. *Id.,* p. 1.

43.     ABC's principal, Jay Brodsky, estimated in testimony before the Department of Consumer Affairs that Gene Gagliardi was serving "4,000 papers a year" – more than 10 per day. **Exhibit E** (DCA Testimony), p. 145.

44.     Accordingly, on July 21, 2009, DCA entered into an assurance of discontinuance against Mr. Gagliardi, revoking his process serving license and permanently barring him from applying for a process server license and engaging in process serving activity in New York City. **Exhibit F** (Gagliardi Assurance of Discontinuance).

45.     Because Mr. Williams was never served and was incarcerated, he did not know he was being sued and did not appear in the action.

46.     On or about August 26, 2008, Tromberg used ABC Defendants' false affidavit of service to obtain a default judgment against Mr. Williams on behalf of Carver. Judgment was entered against Mr. Williams in the amount of $1,323.10. **Exhibit G** (Default Judgment).

47.     Mr. Williams did not learn of the Collection Lawsuit or the default judgment until years later because of the use of a false affidavit of service to obtain a "sewer service" default judgment. Mr. Williams had also never received any letters, post-judgment garnishments or bank restraints, or otherwise learned about the judgment until the collection attempts beginning in January 2021, described below. Therefore, Mr. Williams' claims related to the collection lawsuit, the false affidavit of service, and the default judgment obtained via sewer service are tolled.

### *Mr. Williams Learns of Identity Theft Against Him*

48.     On September 14, 2009, Mr. Williams was released from prison.

49.     Like many formerly incarcerated people, Mr. Williams wanted to turn his life around, work a real job and be responsible.

50.     But as the Consumer Financial Protection Bureau recently reported, formerly incarcerated people are faced with numerous financial difficulties from struggling to secure housing and employment to higher costs for consumer credit. **Exhibit H** (CFPB Report), pp. 27-36.

51.     One of his most important responsibilities was providing healthcare to his mom as an employee of Caring Professionals Inc., which he started working at on or around January of 2016.

52.     On or about January 4, 2021, Tromberg, on behalf of Carver, signed an income execution to Caring Professionals Inc., Mr. Williams' employer.  *See* **Exhibit I** (Income Execution).

53.     The income execution stated that Carver had obtained a judgment for $1,323.10 on August 28, 2008 with a "INTEREST DATE" of August 28, 2008. The Execution directed Caring Professionals to satisfy the judgment by withholding and paying over to the Marshal in installments amount to 10% of wages. *Id.*

54.     Carver and Tromberg had the income execution forwarded to Marshal Ronald Moses for execution upon Mr. Williams' employer.

55.     On or about January 11, 2021, Marshal Ronald Moses served a Notice of Garnishment, listing the total amount as $2,946.25, $1,476.18 of which was interest on the fraudulently procured judgment. **Exhibit J** (Notice of Garnishment).

56.     This Notice was the first time Mr. Williams learned of the collection lawsuit and that there was a judgment against him.

57.     By serving his employer with the income execution, Carver and Tromberg invaded Mr. Williams' privacy and defamed him in the eyes of his employer.

58.     Carver and Tromberg represented that they had a valid judgment and that Mr. Williams

owed a legally enforceable judgment, when in fact the judgment was obtained on a debt that he never incurred using a false affidavit of service.

59.     As soon as he received the Notice of Garnishment, Mr. Williams called the Marshal and said that the Notice must have been mistaken, as it said "Mr. William" rather than Mr. Williams. The Marshal told him that it would be taken care of, so Mr. Williams believed no further action was needed on his part.

60.     On or around April 7, 2021, wages began to be garnished from Mr. Williams' paycheck.

61.     When Mr. Williams realized that his wages were being garnished, he called Tromberg to determine what was going on.

62.     Rather than providing him any information, Tromberg was rude to Mr. Williams and told him that would not get his money back.

63.     On or around December 27, 2021, Mr. Williams filed an Order to Show Cause to vacate the judgment. **Exhibit K** (OSC).

64.     In the OSC, Mr. Williams stated that the first time he received notice of the lawsuit was the Income Execution, and that he had been incarcerated from 2005-2009. *Id.*

65.     The Civil Court Judge, finding merit to the application, signed the Order and a hearing was set for January 24, 2022.

66.     This process was very frustrating because the debt was fraudulent and Mr. Williams didn't owe money to them.

### *Tromberg doubles down on the sewer service by opposing Mr. Williams' OSC with a deceptive Opposition*

67.     On January 18, 2022, Aksana Bondartseva, an associate at Tromberg, executed an Affirmation in Opposition to the Order to Show Cause and mailed the same to Mr. Williams. **Exhibit L** (Opposition to OSC).

68.     Along with the Affirmation, Bondartseva and Tromberg included an undated cover letter seeking payment on the judgment by asking Mr. Williams to call to "resolve this matter amicably." *Id.*

69.     By signing and serving the Affirmation, Bondartseva and Tromberg implicitly represented to Mr. Williams that that they had meaningfully reviewed the facts and circumstances of the judgment and made a reasoned professional determination that the judgment was valid and correspondingly that the Affidavit of Service was truthful.

70.     Bondartseva and Tromberg either failed to perform the necessary meaningful review that would have revealed that Affidavit of Service was made by suspended process server Gene Gagliardi, or they did perform such a review and made the statements in the Opposition aware of their falsity. If nothing else, in relying upon the false affidavit of the notorious sewer service process server Mr. Gagliardi in the Affirmation in Opposition to the Order to Show Cause, Carver and Tromberg ratified the sewer service, and attempted to retain the benefits obtained through that false affidavit: the default judgment.

71.     The Opposition falsely states that the action is "to recover the unpaid credit card that the defendant incurred with Carver Federal Savings Bank." **Exhibit L**, p. 2. This false statement was due either to a failure by Bondartseva and Tromberg to perform a meaningful attorney review, or they performed the meaningful attorney review and falsely characterized the debt to hide its clearly fraudulent nature.

72.     Notably, the Opposition did attach the fraudulent bank account application and checks (*Id.,* pp. 21-22), so the allegation that the debt was from an "unpaid credit card" was clearly false.

73.     By misrepresenting the nature of the debt in the Opposition, Tromberg concealed a

complete defense to the underlying debt while asserting that Mr. Williams had no meritorious defense to the debt.

74.     The Opposition also deceptively characterized the wage garnishment as Mr. Williams "making payments on the judgment" and thus "implicitly acknowledg[ing] the judgment." *Id.,* p. 5.

75.     Without the court file, which was in archives at the time that Mr. Williams filed his OSC, he had no way to dispute the Affidavit of Service because he simply had not seen it until he received it attached to the Opposition. *Id.,* p. 10.

76.     Defendants opposed the OSC, counting on the fact that Mr. Williams was a *pro se* consumer and that during the COVID-19 pandemic it was difficult for him to obtain free legal help, to retain the benefits of their illegally obtained judgment, including but not limited to the $3,571.99 in wages garnished from him.

77.     At the hearing, the Judge asked Mr. Williams to obtain evidence proving that he was incarcerated and did not receive service.

78.     On or around March 27, 2022, Mr. Williams filed a supplement to his OSC, attaching:

- The Notice of Garnishment;

- His Criminal Appearance History, listing his address prior to incarceration;

- His Certificate of Disposition Indictment;

- His history of incarceration, listing the dates he entered different correctional centers and his discharge date of September 14, 2009; and

- His driver's license. **Exhibit M** (OSC Supplement).

79.     Despite this irrefutable evidence that Mr. Williams was the victim of identity theft and

had never received service, Tromberg did not stipulate to discontinue the case or even contact

him prior to the next court hearing, requiring Mr. Williams to go back to court one last time.

80.     On April 27, 2022, Mr. Williams returned to court, where Tromberg's attorney claimed

to have not received the documents and said that they would need to call Tromberg to see what it

wanted to do.

81.     The court told Tromberg no, and instead granted the Order to Show Cause and

discontinued the Collection Lawsuit. **Exhibit N** (Dismissal Order).

82.     The court also ordered Tromberg to return Mr. Williams' garnished wages.

83.     Mr. Williams asked if he would be getting his money back, the $3,571.99 of wages

garnished from him, and he was told by both the judge and the clerk that he would.

84.     A month passed and Mr. Williams did not receive his stolen wages back nor received any

communications from Defendants.

85.     On or around May 25, 2022, Mr. Williams called the Tromberg law firm to have

Tromberg return his previously garnished wage.

86.     Mr. Williams spoke with a manager named Richard Angelo at Tromberg.  Mr. Angelo,

apparently reading from their computer system, told Mr. Williams that there was a court hearing

on April 27 on the OSC, and that the Court had granted his application, vacated the judgment,

and discontinued the action.

87.     Importantly, Mr. Angelo told Mr. Williams that, according to their "attorney report," the

Court had ordered at the April 27 hearing that all moneys garnished by Tromberg were to be

"immediately" returned to him.

88.     Despite this admission by Tromberg that there was a court order requiring them to return

the money, as of this filing, Mr. Williams has still not received the $3,571.99 of wages stolen from him by Defendants.

### *Defendants' theft of $3,571.99 caused Mr. Williams considerable emotional and financial distress, pushing him from the edge into destitution.*

89.      Defendants' unlawfully took $3,571.99 of Mr. Williams' wages based on a sewer service judgment, and have defied a court order by not returning it to Mr. Williams for months.

90.      Mr. Williams has had a rough life, and was already living paycheck to paycheck prior to his wages being garnished, trying to support himself and his daughter.

91.      When he received the Notice of Garnishment it stressed him out, but he thought after he spoke with the Marshal that the issue had been resolved, making it all the worse when months later he learned that his wages were being garnished.

92.      Ever since the wage garnishments started, the issue has been constantly on his mind, making him feel stressed and overwhelmed.

93.      He has only eaten once a day since the garnishments started, both because of the stress and to try to save money.

94.      The stolen wages caused a chain reaction – because he had less money, he could not pay his bills, and because he could not pay his bills, he was hit with late fees and other additional charges that made it even more difficult to catch up.

95.      To make matters worse, Mr. Williams' hours at work got cut down to 4 hours a day. His employer would not tell him why his hours were getting cut, but he suspected it was because of the Income Execution, and it made him scared that he would get fired.

96.      Since August of 2022, Mr. Williams has been homeless because of his financial difficulties, including his money which Defendants have refused to return. He currently resides in a shelter.

97.     He does not like to talk about it because he feels that it makes it worse, but Mr. Williams'

stress has been so bad that it has made him consider suicide.

### BRODSKY and ABC Liability

98.     ABC has a long history of engaging in misconduct in the service of process, including but

not limited to improper use of a DBA name and its process servers filing false affidavits of

service.

99.     The publicly documented fraud and sewer service by ABC Defendants from as early as

June 13, 2008 and continuing into the present, being led, managed, and owned by Defendant Jay

Brodsky the entire time, provides a reasonable inference that fraud and sewer service are

endemic features of ABC Defendants' business model as set and implemented by Jay Brodsky.

100.    On December 27, 2011, ABC entered into a Consent Order with the DCA, agreeing to:

- Review on a monthly basis the completeness and accuracy of the records of its
  process servers;

- Prepare a monthly report of this review and maintain that report for at least 7 years;

- Maintain records of any disciplinary actions taken against its process servers;

- Report to DCA any process servers not complying with the law; and

- Take disciplinary action against process servers who do not comply with the law.
  **Exhibit O** (ABC Consent Order).

101.    On August 23, 2013, the DCA denied ABC's application for temporary authority to

operate as a process serving agency until ABC agreed to pay a fine of $70,000 and abide by

the terms of the previously ordered Consent Order, based on findings that ABC violated New

York City law by:

- Operating under a trade name for which ABC was not licensed ("ABC Process

Service Inc.");

- Failing to comply with the 2011 Consent Order by not reviewing for completeness and accuracy the records of each process server;

- Failing to identify logbook violations in Defendant Azzam Abderrahman's logbook;

- Distributing process to Azzam Abderrahman despite him failing to record his entries properly;

- Failing to report to the DCA three process servers who failed or improperly recorded GPS data;

- Failing to maintain electronic records of the daily activity of Defendant Azzam Abderrahman and 7 other process servers;

- Failing to maintain electronic copies of affidavits of service;

- Failing to include ABC's address on affidavits of service; and

- Failing to report traverse hearings and the results of those hearings. **Exhibit P** (ABC Investigation Letter).

### *Brodsky admissions during testimony before NYC Department of Consumer Affairs*

102.    On June 13, 2008 Mr. Brodsky testified, as the president of ABC, at the Exploratory Public Hearing on Process Server Practices in New York City before the New York City Department of Consumer Affairs ("DCA") in order to determine what additional regulations of process servers should be enacted. **Exhibit E** (DCA Testimony).

103.    Mr. Brodsky's testimony suggested that he had set up ABC in a manner that incentivized sewer service.

104.    Brodsky does not pay process servers in consumer collection cases unless they successfully execute service.

105.    Even when service is successfully executed, Brodsky pays process servers as little as $3.00 for service.

106.    Brodsky does not report to the DCA instances where he is notified that service by one of his process servers is challenged.

107.    Brodsky does not report to DCA when there is a traverse hearing challenging service by one of his process servers, even though he is required to do so.

108.    When asked, "What do you do when you find out that there is a particular process server who has multiple traverse hearings or challenges to his or her services?", he replied "Well, because somebody contests service, it doesn't necessarily mean anything in particular," and that consumers sometimes lie.  *Id*., p. 139.

109.    In other words, Brodsky is not particularly concerned about when he finds out of repeated claims of false affidavits of service against a particular process server he uses.

110.    This apathy is further shown by his failure to learn the result of orders to show cause challenging the veracity of the sworn statements of his process servers, even though all complaints would go through him. *Id*., pp. 139-142.

111.    The result of an order to show cause could also be seen on the free, publicly available online New York eCourts website.

112.    Mr. Brodsky also tacitly admitted that his process servers falsely represent performing service by his estimation of that Defendant Gene Gagliardi was serving "4,000 papers a year" – more than 10 per day. *Id.*, p. 145.

113.    Mr. Gagliardi had his license to serve process revoked in 2009.

114.    Of course, Brodsky minimizes his knowledge of claims of sewer service claims against his process servers, but a review of his roster of process servers shows otherwise.

*Brodsky's roster of sewer service process servers*

115.    The use of Defendant Gagliardi as a process server in the collection lawsuit against Mr.

Williams was not an aberration – ABC, as directed by Brodsky, systematically uses process

servers with documented records of sewer service and other deceptive and unlawful conduct.

116.    On February 16, 2016, Brodsky filed a Renewal License Application for ABC with the

NYC Department of Consumer Affairs. **Exhibit Q** (ABC License Application).

117.    This Application included a required "Roster of Process Servers," listing five process

servers: (1) Schadrac Laguerre, (2) Jessica Feldman, (3) Ahmed A. Abderrahman, (4) Bassem

Elashrafi, and (5) Sean Alexander.

118.    Of these five process servers, three (Laguerre, Abderrahman, and Elashrafi) have a

history of sewer service and other deceptive conduct as revealed by court decisions, consumer

complaints, and investigations and disciplinary actions by the Department of Consumer Affairs.

*Laguerre*

119.    Mr. Laguerre was ordered by the DCA to appear at a hearing on June 16, 2009 to

establish whether his "license to operate as an Individual Process Server should not be suspended

or revoked, why monetary penalties should not be imposed on [him] and why [he] should not be

prohibited, based on lack of fitness, from holding any license issued by the Department on the

grounds specified herein." **Exhibit R** (Laguerre Notice of Hearing).

120.    This Hearing was the result of the DCA's investigation finding that Mr. Laguerre had

signed false affidavits of service and engaged in sewer service, specifically:

- Mr. Laguerre had executed two affidavits of service claiming he had served process

    on April 30 and May 1, 2008 despite having no entries for this service in his logbook

    and telling the DCA he did not serve any process on those days;

- Mr. Laguerre had executed an affidavit of service claiming he had served process on March 5, 2008 despite having no entries for this service in his logbook, entries in his logbook which inferred he was serving other process at the time, and the alleged recipient stating he was never served;

- Mr. Laguerre admitted his service had been contested 5-10 times between 2006-2009 but he did not report, as he was required to do, those traverse hearings to the DCA; and

- Mr. Laguerre failed to record his service of process in his logbook chronologically, including service of process in 2008. *Id.*

121.    On June 12, 2009, Mr. Laguerre entered into an Assurance of Discontinuance with the DCA regarding the above-listed violations, where he agreed to:

- Revoke his license to serve process and be barred from reapplying or holding any process server license for 2 years;

- Not engage in any "process serving activity" in the City of New York including but not limited to serving, assigning, distributing, or delivering process for service to anyone else to serve on his behalf or on behalf of any company he had an interest in; and

- Pay a fine of $1,000. **Exhibit S** (Laguerre Assurance of Discontinuance).

122.    On March 1, 2021, Mr. Laguerre entered into another Consent Order with the DCA, requiring him to, among other items:

- Pay a fine of $750; and

- Pay additional civil penalty of up to $500 if he did not comply with the reporting requirements in the Consent Order. **Exhibit T** (Laguerre Consent Order).

123.    Additionally the Consent Order stated that breach of the Consent Order "shall be sufficient grounds for the revocation of Respondent's license and for ineligibility to be licensed for a period of five years." *Id.*

*Abderrahman*

124.    On August 27, 2012, Ahmed Abderrahman entered into a Consent Order with the DCA, where he agreed to:

- Enter into a contract with an independent third party to maintain electronic records of his process service;

- Not sign or notarize any affidavit of service until all factual averments have been set forth;

- Not sign any affidavit that could mislead a reader;

- Assume the burden of showing any affidavit that he signed was not intended to be misleading;

- Not use fictious names to refer to persons in affidavits of service;

- Maintain a list of each agency he worked for;

- Not wear any badges, insignias, shields, medals, or decorations while serving process, and to display his DCA identification card upon request by recipients of service;

- Attend any future training on compliance with the law in service of process in New York City upon notice by the DCA and to provide proof or have his license revoked;

- Pay a $500 fine; and

- Have his license revoked and be unable to reapply for 5 years if he breached the Consent Order. **Exhibit U** (Ahmed Abderrahman Consent Order).

125.    Despite this Consent Order, the DCA subsequently order Mr. Abderrahman to appear for

a hearing on June 18, 2014 to answer the following charges:

- Failing to attempt to learn the results of a traverse hearing;

- Failing to report to the DCA the final result of the traverse hearing or that he had attempted to learn the final result;

- Failing to learn the results of a traverse hearing; and

- Failing to obtain a copy of the court's decision regarding the traverse hearing. **Exhibit V** (Ahmed Abderrahman Notice of Hearing).

126.    While this hearing did not proceed, Mr. Abderrahman was soon thereafter reported by another process serving agency he was working for, on October 24, 2014, for "pre-sign[ing] an Affidavit of Service prior to its written completion."

*Elashrafi*

127.    Bassem A. Elashrafi came under scrutiny by the DCA in 2019 after two traverse hearings where he failed to produce his logbooks and claimed that the logbooks were in the possession of the DCA.

128.    On May 7, 2020, the DCA denied Mr. Elashrafi's license application, effectively ending his ability to engage in process server activity in New York City, because Mr. Elashrafi:

- Failed to bring to two traverse hearings his logbooks and lied that he did not bring them because they were in the DCA's possession;

- Lied under oath that the DCA was in possession of his logbooks from 2016; and

- Falsely claimed that he had correspondence with DCA proving that he surrendered the logbooks. **Exhibit W** (Elashrafi License Denial).

***ABC and Jay Brodsky's Sewer Service Against Mr. Williams in 2008 Is Part of a Long History of Sewer Service and Other Process Service Misconduct***

129.    ABC and Mr. Brodsky engaged in sewer service in 2008, including against Mr.

Williams, and the continued misconduct by them and process servers they use as recently as 2021 evinces that this practice of sewer service was either intentional or done with wanton disregard for the rights of consumers like Mr. Williams.

130.    ABC's intent is born out not only from these 13 years of consistent and pervasive process service misconduct but further the continued use of process servers despite being put on notice of their misconduct.

131.    Brodsky's and ABC's negligent selection, hiring, training, supervising, and use of Defendant Azzam Abderrahman to serve process on Mr. Williams and others was not a one-off mistake – their entire practice of hiring and using of process servers is, at minimum, grossly negligent for egregiously failing to investigate or outright ignoring the history of misconduct of the process servers.

### D.      COUNT 1: FAIR DEBT COLLECTION PRACTICES ACT
### (as to Tromberg and Bondartseva)

132.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

133.    The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses."  15 U.S.C. § 1692(e); see also *Hamilton v. United Healthcare of La., Inc.*, 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

134.    Congress designed the FDCPA to be enforced primarily through private parties – such as

plaintiff – acting as "private attorneys general." *See* S. Rep. No. 382, 95th Con., 1st Sess. 5, ("[t]he committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance"); and *Jacobson v. Healthcare Fin. Servs.,* 516 F.3d 85, 91 (2d Cir. 2008) ("[i]n this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought by others.").

135.    The obligation alleged to be owed by plaintiff is a "debt" as defined by 15 U.S.C. § 1692a(5) because the putative debt was incurred primarily for family, personal or household purposes. Notably, in the Verified Complaint, Tromberg stated the putative debt arose from a "consumer credit transaction."

136.    For the reasons stated in the "Parties" section of this Complaint, Tromberg and Bondartseva are debt collectors within the meaning of 15 U.S.C. § 1692a(6).

137.    Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Plaintiff was alleged to owe a "debt."

138.    Tromberg and Bondartseva violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e and 1692f.  By way of example and not limitation, Defendants Tromberg and Bondartseva violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; falsely representing or implying an individual is an attorney or that a communication is from an attorney; threatening to take and actually taking an action prohibited by law; and using unfair or unconscionable means.

139.    Plaintiff does not bring FDCPA claims against any conduct of Defendants prior to one year before the filing of this lawsuit.

140.    The injuries inflicted on Plaintiff by Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

141.    Mr. Williams suffered economic injuries that historically has provided a basis for lawsuits in American courts, including but not limited to $3,571.99 in stolen wages; out of pocket expenses for making copies, for postage, for a notary, and for travel including subway fare; lost time for having to go to the courthouse, appear on his OSC to vacate a sewer service judgment, and to gather evidence for the OSC Supplement.

142.    Mr. Williams' injuries are analogous to, *inter alia*, the following common law claims: defamation, negligence, invasion of privacy, intrusion upon seclusion, malicious civil prosecution, and abuse of process.

143.    Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of companies to attempt to collect the debt, in ensuring that a debt is not linked to the wrong party, and in furnishing agents with accurate information when those agents rely on and use that information in attempting to collect debts.

**E.      COUNT 2: NEW YORK GENERAL BUSINESS LAW SECTION 349 *ET SEQ.***
**(as to all Defendants )**

144.    Plaintiff repeats and re-alleges each and every allegation set forth above as if reasserted and re-alleged herein.

145.    New York General Business Law Section 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state…"

146.    An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such action." N.Y. Gen. Bus. Law § 349(h). An individual may also be awarded punitive damages.

147.    As enumerated in the Statement of Facts, Defendants violated N.Y. Gen. Bus. Law § 349 et seq. by using deceptive acts and practices in the conduct of their businesses that have broad impact on consumers at large.

148.    Defendants' wrongful and deceptive acts caused injury and damages to Plaintiff.

149.    As a direct and proximate result of those violations of N.Y. Gen. Bus. Law § 349 et seq, Plaintiff suffered compensable harm and is entitled to preliminary and permanent injunctive relief, and to recover actual, treble, exemplary, and punitive damages, together with costs and attorney's fees.

150.    The injuries inflicted on Plaintiff by Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

151.    Mr. Williams suffered economic injuries that historically has provided a basis for lawsuits in American courts, including but not limited to $3,571.99 in stolen wages; out of pocket expenses for making copies, for postage, for a notary, and for travel including subway fare; lost time for having to go to the courthouse, appear on his OSC to vacate a sewer service judgment, and to gather evidence for the OSC Supplement.

152.    Mr. Williams's injuries are analogous to the following common law claims: defamation, negligence, invasion of privacy, intrusion upon seclusion, malicious civil prosecution, and abuse of process.

153.     Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of companies to attempt to collect the debt, in ensuring that a debt is not linked to the wrong party, and in furnishing agents with accurate information when those agents rely on and use that information in attempting to collect debts.

### F.    COUNT 3: NY JUDICIARY LAW § 487
### (as to Tromberg and Bondartseva)

154.     New York Judiciary Law § 487 creates a private right of action against an attorney or counselor who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party;" or "willfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for."

155.     As enumerated in the Statement of Facts, Tromberg and Bondartseva violated Judiciary Law § 487.

156.     Plaintiff is entitled to actual damages, treble damages, and attorneys' fees and costs for the violations of N.Y. Judiciary Law § 487, and Plaintiff so seeks.

157.     The injuries inflicted on Plaintiff by Tromberg and Bondartseva are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

158.     N.Y. Judiciary Law § 487 is "the modern-day counterpart of a statute dating from the first decades after Magna Carta; its language virtually (and remarkably) unchanged from that of a law adopted by New York's Legislature two years before the United States Constitution was ratified." *Amalfitano v. Rosenberg,* 12 N.Y.3d 8, 14 (N.Y. 2009).

159.     Because of the special injuries inflicted by an attorney using deceit to mislead the court or any party, an injury to the integrity of the court proceedings and the use of the courts to determine the truth, a deceit does not need to be successful to violate N.Y. Judiciary Law § 487.

*Id.*

160.    In addition to those special injuries, economic injuries that are the proximate result of the deceit, namely the expenses of defending against a deceitful lawsuit, are recoverable under N.Y. Judiciary Law § 487. *Id*

161.    Mr. Williams suffered economic injuries that historically has provided a basis for lawsuits in American courts, including but not limited to $3,571.99 in stolen wages; out of pocket expenses for making copies, for postage, for a notary, and for travel including subway fare; lost time for having to go to the courthouse, appear on his OSC to vacate a sewer service judgment, and to gather evidence for the OSC Supplement.

### G.    COUNT #4: GROSS NEGLIGENCE (AS TO ALL DEFENDANTS)

162.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

163.    Defendants, as putative creditor assignee, debt collectors, and process servers, owed Mr. Williams a duty of reasonable care in their debt collection efforts.

164.    Defendants' failure to exercise even slight care or slight diligence amounts to gross negligence.

165.    Had Defendants made even the smallest effort to review the Verified Complaint and Affidavit of Service when they received Mr. Williams's OSC, they would have seen that the judgment was procured using an affidavit by a notoriously deceitful process server, Gene Gagliardi, and consented to vacating the judgment and discontinuing the lawsuit with prejudice.

166.    Brodsky's and ABC's negligent selection, hiring, training, supervising, and use of Defendant Gene Gagliardi to serve process on Mr. Williams and others was not a one-off mistake – their entire practice of hiring and using of process servers is, at minimum, negligent

for failing to investigate or outright ignoring the history of misconduct of the process servers.

167.    Defendants' actions evince a reckless disregard for the rights of others and smack of intentional wrongdoing, particularly the due process rights for consumers underlining the purpose of the statute of limitations on a sale of goods cause of action.

168.    Upon information and belief, Defendants' conduct was part of a broader pattern of misconduct aimed at the public in general.

169.    Defendants' conduct demonstrates a high degree of moral culpability and willful or wanton negligence or recklessness. As a result, Mr. Williams is entitled to a punitive damage award.

170.    Mr. Williams suffered economic injuries that historically has provided a basis for lawsuits in American courts, including but not limited to $3,571.99 in stolen wages; out of pocket expenses for making copies, for postage, for a notary, and for travel including subway fare; lost time for having to go to the courthouse, appear on his OSC to vacate a sewer service judgment, and to gather evidence for the OSC Supplement.

### H.    COUNT # 5: Negligence (as to all Defendants).

171.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

172.    Defendants owed Plaintiff a reasonable duty of care to not engage in deceptive acts and unlawful practices in the conduct of their business.

173.    Defendants breached these duties.

174.    As a direct and proximate result of Defendant's breach of these duties, Mr. Williams suffered compensable harm, including actual damages and emotional distress.

175.    Defendants, as putative creditor assignee, debt collectors, and process servers, owed Mr. Williams a duty of reasonable care in their debt collection efforts.

176.    Defendants' failure to exercise even slight care or slight diligence amounts to gross negligence.

177.    Had Defendants made even the smallest effort to review the Verified Complaint and Affidavit of Service when they received Mr. Williams's OSC, they would have seen that the judgment was procured using an affidavit by a notoriously deceitful process server, Gene Gagliardi, and consented to vacating the judgment and discontinuing the lawsuit with prejudice.

178.    Brodsky's and ABC's negligent selection, hiring, training, supervising, and use of Defendant Gene Gagliardi to serve process on Mr. Williams and others was not a one-off mistake – their entire practice of hiring and using of process servers is, at minimum, negligent for failing to investigate or outright ignoring the history of misconduct of the process servers.

179.    Mr. Williams suffered economic injuries that historically has provided a basis for lawsuits in American courts, including but not limited to $3,571.99 in stolen wages; out of pocket expenses for making copies, for postage, for a notary, and for travel including subway fare; lost time for having to go to the courthouse, appear on his OSC to vacate a sewer service judgment, and to gather evidence for the OSC Supplement.

**I.    COUNT #5: Violations of N.Y.C. Admin. Code § 20-409.2 (AS TO ABC, GAGLIARDI AND BRODSKY)**

180.    New York City Administrative Code § 20-409.2 states that "Any person injured by the failure of a process server to act in accordance with the laws and rules governing service of process in New York state, including this subchapter and regulations promulgated thereunder, shall have a cause of action against such process server and process serving agency, which distributed or assigned process for service, in any court of competent jurisdiction."

181.    New York City Administrative Code § 20-409.2 allows individuals to recover

compensatory damages, punitive damages (for willful failure to service process only), injunctive and declaratory relief, costs, and attorneys' fees.

182.    Defendants ABC, Gagliardi, and Brodsky violated New York City Administrative Code § 20-409.2 by failing to act in accordance with the laws and rules governing service of process in New York state, and did so negligently and or willfully.

183.    As a direct and proximate result of these violations of New York City Administrative Code § 20-409.2, Plaintiff has suffered and continue to suffer compensable harm and are entitled to recover compensatory and punitive damages, costs, and attorneys' fees.

### J.        COUNT #6: Conversion (as to Tromberg and Carver)

184.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

185.    Defendants are jointly and severally liable for conversion. Carver, as the party in the collection lawsuit, acted through its agent, Tromberg, in converting Mr. Williams' money. Tromberg was acting within the course and scope of the authority given to them by Carver.  For purposes of the conversion claim, the acts of Tromberg are the actions of Carver.

186.    The elements of conversion in New York State include: 1) having a possessory interest in property; and 2) having the possessory interest taken or interfered with by another in a manner that is contrary to the possessor's rights.

187.    Property subject to conversion includes readily identifiable funds from wages.

188.    Defendants intentionally and without authority, assumed and exercised control over Mr. Williams' wages based on a sewer service judgment, interfering with his right to possession of the same.

189.     In other words, Defendants never had a legitimate basis or authority to garnish Mr. Williams' wages, and thus the wage garnishments from their onset constituted conversion.

190.     Defendants have continued to do so even after a court order vacating the judgment and ordering the return of the money on April 27, 2022.

191.     Defendants' improper seizure of and failure to return Mr. Williams' money, which harmfully interfered with Mr. Williams' rights to control his own property, constitutes conversion.

192.     For the reasons stated in the statement of facts, Defendants' conduct is gross, wanton or deliberate and demonstrates a high degree of moral culpability. The conduct demonstrates malice, insult, and/or willful or reckless disregard of Mr. Williams' rights, or other aggravated acts. Defendants' conduct evidences a high degree of moral culpability, or is so flagrant as to transcend mere carelessness, or constitutes willful or wanton negligence or recklessness to justify a punitive damage award.

193.     For these reasons, Plaintiff is entitled to punitive damages, in addition to actual damages. Actual damages include, *inter alia*, the loss of use of money for the period Defendants wrongfully exercised dominion and control over Plaintiff's wages, and consequential damages resulting therefrom, including but not limited to interest and late fees. Plaintiff suffered serious mental distress and disruption of his daily life.

194.     Carver is directly liable as the judgment creditor and is vicariously liable for the acts of Tromberg.

### **K.       JURY DEMAND.**

195.     Plaintiff demands a trial by jury.

## L.      PRAYER

WHEREFORE, Plaintiff requests the following relief:

a.      A declaration that all Defendants have committed the violations of law alleged in this action;

b.      Statutory damages;

c.      Reasonable attorney's fees and costs;

d.      Actual damages;

e.      Compensatory damages;

f.      Treble damages;

g.      Exemplary and punitive damages;

h.      An order, pursuant to GBL 349(h) and N.Y.C. Admin. Code § 20-409.2, enjoining and directing Defendants to cease violating those statutes;

i.      Prejudgment and post judgment interest as allowed by law;

j.      All other relief, in law and in equity, both special and general, to which Plaintiff may be justly entitled.


Dated:  Brooklyn, New York
        September 30, 2022

                        Respectfully submitted,


                        /s/ Ahmad Keshavarz

                        Ahmad Keshavarz
                        Emma Caterine
                        The Law Office of Ahmad Keshavarz
                        16 Court St., 26th Floor
                        Brooklyn, NY 11241-1026
                        Phone: (718) 522-7900
                        Fax:    (877) 496-7809
                        Email: ahmad@NewYorkConsumerAttorney.com